### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

KEVIN MCCUBBIN                                                    PLAINTIFF

v.                                                    NO. 3:22-CV-474-BJB

THE ANDERSONS, INC.                                               DEFENDANT

### MEMORANDUM OPINION & ORDER

Kevin McCubbin, a grain farmer from Kentucky, allegedly entered several contracts to sell grain and other crops to The Andersons, an Ohio-based agricultural company.  Motion to Compel Arbitration (DN 5) at 2.[1]  The Andersons demanded grain from McCubbin in January of 2022, invoiced McCubbin for more than $600,000 when he didn't deliver, and finally followed up with an arbitration demand.  McCubbin responded by suing in state court, alleging the contracts (including the arbitration provisions) are invalid as the product of fraud, misrepresentation, and negligence.  Complaint (DN 1-2) ¶¶ 69–90.  After The Andersons removed the case, the parties filed dueling motions to compel and stay arbitration.

Both motions join issue on one question: whether the parties validly entered into an agreement to arbitrate this contract dispute.  The record shows they did—and that the arbitration agreement covers this dispute.  So the Court grants the motion to compel arbitration and denies McCubbin's motion to stay arbitration.

## I. Allegations

This dispute—like several related cases[2] —emerged from a soured relationship between The Andersons and a grain farm.  According to McCubbin, he began selling excess grain to The Andersons and its predecessor, through its agents in 2019.

---

[1] The Sixth Circuit, in another dispute over "flex agreements" and arbitration, described The Andersons (at least its 1990s incarnation) as "a multi-division/location agri-business firm headquartered in Maumee, Ohio, in the business of originating, merchandising, conditioning, and storing grain and grain products, and other agri-businesses."  *The Andersons, Inc. v. Horton Farms, Inc.*, 166 F.3d 308, 313 (6th Cir. 1998).

[2] Similar cases and practically identical motions are pending before this Court.  The same lawyers represent The Andersons and the farmer-plaintiffs in these cases, and the Court (with the parties' agreement) held a combined hearing on June 12, 2023, that covered each case.  *See* Case Nos. 1:22-cv-115, 1:22-cv-117, 1:22-cv-118, 3:22-cv-472, 3:22-cv-473.  The plaintiffs in these cases, including McCubbin, previously sued the agents who allegedly induced them to sign.  *Alford v. Brooks*, 618 F. Supp. 3d 621 (E.D. Ky. 2022).

Complaint ¶¶ 7–11 (describing contracts entered into and executed "[o]n several occasions in 2019"). McCubbin alleges that agents for The Andersons (Trigg Routh and Boyd Brooks) entered into several contracts on his behalf between December 2019 and November 2021 without his knowledge or authorization; these contracts purportedly obligated him to sell grain and other crops to The Andersons at deferred prices. ¶¶ 12–13, 18, 22–35.

The parties' disjointed contracting process probably shouldn't serve as a model for law students learning how to clearly memorialize agreements. The documents they shared were all dated or shared electronically in a manner that didn't necessarily track the parties' relationship on the ground. Three such documents bear on the parties' agreements and this Court's resolution of the arbitration request: the Customer Flex Agreement, the Invoice Contracts, and the Additional Terms.

First, on May 28, 2020, McCubbin signed a "Customer Flex Agreement," which The Andersons' agent apparently said was "to have background information on file." ¶¶ 14–17; Flex Agreement (DN 1-2) at 1–2. Before then, the parties had apparently not signed any contracts (or even documented their specific transactions). ¶ 18. The Flex Agreement, by its terms, applied to "all contracts" without any temporal limitation. And it states that "[a]ll Contracts will be governed by the Standard Purchase Contract Terms on the reverse side of each Purchase Contract ... along with applicable Grain Trade Rules of the National Grain and Feed Association," and provides that "any disputes or controversies arising out of contracts shall be arbitrated by the National Grain and Feed Association." Flex Agreement at 1.

Second, the record includes several "Invoice Contracts." *See* DN 1-2 at 17–18, 24–30 ("Confirmation of DEFERRED PRICE Purchase"). They feature different dates from 2019 to 2021, though the signatures are all dated January 21, 2021. *Id.* And each identifies different "Futures Months" in 2021 or 2022. *Id.* They contain the electronic signatures of Cliff Arfman or Trigg Routh on behalf of The Andersons and Kevin McCubbin on behalf of himself; each additionally states that "failure to [sign and return] will be construed as acceptance."[3] An agent for The Andersons (Aaron Lloyd) allegedly emailed McCubbin and asked him to sign this series of contracts, which he attached to that email. Complaint ¶ 41. Each is a single page, with "Page 1 of 2" or "Page 1 of 4" at the bottom. DN 1-2 at 17–18, 24–30. Above each signature

---

[3] One of the Invoice Contracts involved contains no signature for McCubbin—at least not as it appears in the record. *See* DN 1-2 at 30. The others contain an electronic signature for him. McCubbin's Complaint alleges that this unsigned contract is not enforceable, Complaint ¶ 56, but his response to the motion to compel doesn't argue that arbitration is unavailable on this basis. Regardless of its ultimate validity, however, this contract is still covered by the Flex Agreement, which determines the arbitrability of the alleged contract. *See* Motion to Compel at 14 n.6. And McCubbin doesn't dispute that he signed the Flex Agreement.

line, the contract contained a sentence stating "Parties Accept Additional Terms Attached" in bolded letters.  *Id.*

Third, the email attaching these Invoice Contracts also included a single copy of a "Contract Terms and Conditions" sheet.  *See* Renewed Motion to Stay (DN 8) at 4; Motion to Compel at 9–10.  This sheet, apparently provided twice, said "Page 2 of 2" at the bottom of one copy and "Page 2 of 4" at the bottom of another and contains a statement that "any disputes or controversies arising out of this Contract shall be arbitrated by the NGFA pursuant to its Arbitration Rules."  Contract Terms & Conditions (DN 1-1) at 31 ¶ 2; Renewed Motion to Stay at 4.  McCubbin signed most— if not all—of the Invoice Contracts (though how he transmitted the signed contracts remains unclear).  But the Contract Terms and Conditions page didn't contain a signature line and is unsigned.  Renewed Motion to Stay at 4.

In the months that followed, the contractual relationship deteriorated and (according to the Complaint) the grain market turned significantly.  Complaint ¶¶ 36–48.  The deadlines set out in the invoices came and went, but McCubbin didn't satisfy the disputed contracts.  ¶¶ 50–51.  In February 2022, The Andersons invoiced McCubbin for $615,087.50 based on his failure to deliver on these crop-sale contracts.  *Id.*  In March, The Andersons initiated arbitration proceedings against McCubbin before the NGFA based on the arbitration language in the Flex Agreement and Invoice Contracts.  *See* Notice of Removal (DN 1) ¶¶ 1, 5; Arbitration Letter (DN 1-1) at 2–3.  Then, in August, McCubbin filed a lawsuit against The Andersons alleging that the contracts were the product of fraud and negligence and seeking a stay of the arbitration proceedings.  Complaint ¶¶ 61–90.  The Andersons removed that lawsuit to this Court and filed this motion to compel arbitration.  Notice of Removal ¶ 1; Motion to Compel at 1–2.  McCubbin filed a combined (and renewed) motion to stay the arbitration proceeding and response to the motion to compel.  *See* DNs 8, 9, 10 ("Renewed Motion to Stay").

## II. Arbitrability

The Andersons moved to compel arbitration under Section 4 of the Federal Arbitration Act.  9 U.S.C. § 4.  The FAA establishes a strong federal policy in favor of arbitration and mandates the enforcement of written agreements to arbitrate.  *See, e.g.*, *KPMG LLP v. Cocchi*, 565 U.S. 18, 21–22 (2011).  But before a court may compel arbitration of a contract claim, it must determine that the parties agreed to arbitrate the dispute.  *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010).  That is, if one side contests "whether a valid arbitration agreement exists," the Court must be satisfied that "neither the formation of the parties' arbitration agreement nor (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute is in issue."  *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 879 (6th Cir. 2021) (quoting *Granite Rock Co. v. Int'l*

*Bhd. of Teamsters*, 561 U.S. 287, 299 (2010)) (cleaned up).

Here, the parties accept that the arbitration provision—if enforceable—would cover this dispute. *Cf. AT&T Techs. v. Comm. Workers of Am.*, 475 U.S. 643, 650 (1986) (arbitration must be compelled unless it's clear that "the arbitration clause is not susceptible of an interpretation that covers the asserted dispute") (citation omitted). The question is whether that arbitration provision is valid. When that question is "in issue," the Court must proceed to trial to determine if the parties formed a valid arbitration agreement. *Great Earth Companies v. Simons*, 288 F.3d 878, 889 (6th Cir. 2002) (citing 9 U.S.C. § 4). To place validity in issue, "the party opposing arbitration must show a genuine issue of material fact as to the validity of the agreement." *Id.* All issues of contract formation and interpretation are governed by Kentucky law. *See In re StockX*, 19 F.4th at 881, 881 n.4.

 McCubbin argues that "there were no provisions for arbitration" on any of "the alleged pages to which [he] affixed his signatures." Renewed Motion to Stay at 7. The Andersons, for its part, points to two different signed arbitration agreements: (1) the Flex Agreement and (2) the Invoice Contracts. Motion to Compel at 3–4, 9–10. Because both documents are enforceable, each supplies an independent and sufficient basis for enforcing arbitration of this dispute.

**A. Flex Agreement.** This document states that it applies to "all contracts." It goes on to provide that "any disputes or controversies arising out of contracts shall be arbitrated by the National Grain and Feed Association." Flex Agreement at 1–2. This is an unambiguous agreement to arbitrate that, by its terms, covers McCubbin's contract claims, which unquestionably arise from the agreements and the "contracts" it refers to. So the Flex Agreement, on its face, calls for arbitration. *See In re StockX*, 19 F.4th at 878–79.

McCubbin's motion to stay and response to the motion to compel arbitration offer no specific rebuttal to the plain text of the Flex Agreement. The argument section of his brief makes arguments related only to the Invoice Contracts. *See* Renewed Motion to Stay at 4–9. And McCubbin doesn't dispute that he signed the Flex Agreement. *See* Flex Agreement at 1–2 (signed agreement); Renewed Motion to Stay at 4. So there is no reason to doubt the formation of this contract or its applicability to this case.[4] And courts presume arbitrability when interpreting the

---

[4] McCubbin didn't argue that the contract lacked consideration. But when the issue arose at the hearing, the parties discussed how, under Kentucky law, "an arbitration clause requiring both parties to submit equally to arbitration constitutes adequate consideration." *Energy Home, Div. of Southern Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (quoting *Kruse v. AFLAC Intern., Inc.*, 458 F.Supp.2d 375, 385 (E.D. Ky. 2006)).

scope of an arbitration agreement, so arbitration is appropriate.  *See AT&T Techs.*, 475 U.S. at 650.

   **B. Invoice Contracts.**  The terms of these documents likewise sufficiently justify the motion to compel arbitration.  Each agreement contains language above the signature line stating that the "Parties Accept Additional Terms Attached."  DN 1-2 at 17–18, 24–30.  The only attached terms sent with the Invoice Contracts were the "Page 2 of 2" (or "Page 2 of 4") Contract Terms and Conditions page.  That document includes a provision stating that "any disputes or controversies arising out of this Contract shall be arbitrated by the NGFA pursuant to its Arbitration Rules."  Contract Terms & Conditions ¶ 2.  Based on the record before the Court, the only Page 2 that would sensibly accompany the Invoice Contracts—each marked with "Page 1 of 2" or "Page 1 of 4"—is the Contract Terms and Conditions page including the arbitration provision.  And although McCubbin acknowledges receiving a "Page 2 of 2" and a "page 2 of 4" in the same email as the "Page 1[s]," he offers no alternative explanation for what the "Page 2" might connect to if not the accompanying pages.  *See* Renewed Motion to Stay at 4.  McCubbin indisputably signed the Invoice Contracts, though he didn't sign the single accompanying Contract Terms and Conditions page ("Page 2 of 2" and "Page 2 of 4").

   Does the lack of a signature on page 2 mean, as McCubbin argues, that he did not validly agree to its arbitration provision when he signed on page 1?  Renewed Motion to Stay at 7 ("The pages the Plaintiff signed clearly make no reference to arbitration.").  In *Dixon v. Daymar Colleges Group*, the Kentucky Supreme Court held that a signature on the front page of a two-page document failed to assent to an arbitration provision on the second page.  483 S.W.3d 332, 346 (Ky. 2015).  The Statute of Frauds (KRS § 371.010), the court observed, applied and mandated a signature at the end of the document under KRS § 446.060: "When the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature is subscribed at the end or close of the writing."  *Dixon*, 483 S.W.3d at 344.

   But *Dixon* also recognized that "the statute [KRS § 446.060] does not abolish incorporation by reference."  *Id.*  And the invoice contracts in this case contain clear language stating that the parties accept the additional attached terms.  *See* DN 1-2 at 17–18, 24–30.  To validly incorporate terms by reference: (1) the contract must contain "clear language expressing the incorporation of other terms," and (2) it "must be clear that the parties to the agreement had knowledge of and assented to the incorporated terms."  *Dixon*, 483 S.W.3d at 344 (approvingly citing *Bartelt Aviation, Inc. v. Dry Lake Coal Co.*, 682 S.W.2d 796, 798 (Ky. Ct. App. 1985), for the proposition that an arbitration agreement may be incorporated by reference) (cleaned up); *see also Univ. of Ky. v. Regard*, 670 S.W.3d 903, 912–13 (Ky. 2023) (collecting cases).  These requirements are all satisfied here: the incorporation language is clear, it

appears in bold typeface, and the record shows that McCubbin had the additional terms in his possession. *See* Renewed Motion to Stay at 4 ("The same email also included single copy of a 'Page 2 of 2….'").[5] Because McCubbin signed a page agreeing to incorporation language, "it is a logical inference that the signer agrees to be bound by everything incorporated." *Dixon*, 483 S.W.3d at 344 (quotation marks omitted).

McCubbin argues that *Dixon* applies to these terms and defeats arbitrability because the single copy of the "Page 2 of 2" Contract Terms and Conditions is the second page of each Invoice Contract—not a freestanding document incorporated by reference. McCubbin similarly argues that the "Page 2 of 4" cannot be incorporated by reference to the "Page 1 of 4" Invoice Contract. True enough, one of the reasons the Terms and Conditions pairs with the Invoice Contracts is because of the imperfect but reasonable association between the page numbers of these documents. But the Contract Terms and Conditions is better understood as an attachment incorporated by reference. First, only one or two copies of the Contract Terms and Conditions was provided, along with several Invoice Contracts. So McCubbin's conception of an unsigned second page would work for at most one or two of the "Page 1[s]." Second, the Invoice Contracts expressly incorporate "Additional Terms Attached," the only additional terms were indeed attached to the agent's email as the Contract Terms and Conditions, and the terms were *not* a part of a single connected document but rather a separate "Attached" file. This aligns with the concept of incorporating a separate document, not including "hidden" terms at the bottom of a contract. *Cf. Dixon*, 483 S.W.3d at 344–46 (citing incorporation-by-reference decisions).

No evidence in the record and no language in any of the documents rebuts The Andersons' position that the Invoice Contracts incorporated the Contract Terms and Conditions by reference—just as the disclaimer ("Additional Terms Attached") stated. So the signed Invoice Contracts offer a separate and independent basis—in addition to the Flex Agreement—for enforcing the arbitration provision set out in the Contract Terms and Conditions.[6]

---

[5] The applicability of the arbitration provision in the Contract Terms and Conditions page is further bolstered by the terms of the Flex Agreement. That agreement says, in relevant part, that "[a]ll Contracts will be governed by the Standard Purchase Contract Terms on the reverse side of each Purchase Contract." Flex Agreement at 1. Although no document in the record is labeled with the precise title "Purchase Contract," that appears to refer most naturally to the Invoice Contracts and the accompanying "Contract Terms and Conditions."

[6] McCubbin also alleged that two of the Invoice Contracts—QX30089 and QX30097—are fabricated. Complaint ¶¶ 24–26, 30–32. This based on the incorrect dates listed on the Invoice Contracts and apparent discrepancies in the layout of the contract numbers on the page. *See id.* These allegations are curious and perhaps even concerning. But they offer no basis to change the decision given that the Flex Agreements would still compel arbitration of any dispute relating to these Invoice Contracts even if McCubbin established sufficient doubt

## ORDER

Because the record indicates the parties entered into valid arbitration agreements, the Court grants the motion to compel arbitration (DN 5), denies the motion to stay arbitration (DNs 8, 10), and stays this case pending the result of the arbitration proceeding.

Benjamin Beaton, District Judge

United States District Court

September 26, 2023

---

about them.  And his response to the motion to compel doesn't argue that arbitration is unavailable on this basis.  McCubbin, of course, may pursue this issue in arbitration if he so chooses.